UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HECTOR LORENZO,                      )
                                     )
        Plaintiff,                   )        No. 12-cv-2475
                                     )
                                     )        Magistrate Judge Susan E. Cox
MICHAEL J. ASTRUE, Commissioner of   )
Social Security,                     )
                                     )
        Defendant,                   )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Hector Lorenzo, seeks judicial review of a final decision of the Commissioner of

the Social Security Administration ("SSA") denying his application for disability insurance benefits

("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("the Act").[1] Mr.

Lorenzo has filed a motion for summary reversal, seeking to reverse the Commissioner's final

decision or remand the case for consideration of the issues raised herein. The Commissioner has also

filed a cross motion for summery of judgment. For the reasons set forth below, Mr. Lorenzo's

motion for summary judgment is denied [dkt. 19] and the Commissioner's motion is granted [dkt.

27].

## I.      Procedural History

Mr. Lorenzo applied for DIB and SSI on June 22, 2009, alleging disability beginning

October 1, 2006.[2] On November 3, 2009, Mr. Lorenzo requested a hearing before an Administrative

Law Judge ("ALJ"), which was granted on August 11, 2010.[3] A hearing took place before ALJ

---

[1] 42 U.S.C. §§416(I), 423, and 1381 *et seq.*
[2] R. at 131-141.
[3] R. at 94-100.

Roxanne J. Kelsey in Orlando Park, Illinois, on September 20, 2010.[4] Following the hearing, the

ALJ issued an unfavorable decision on October 27, 2010, concluding that Mr. Lorenzo was not

disabled under sections 206(i) and 223(d) of the Act through December 31, 2007, the last date

insured.[5] The Appeals Council denied Mr. Lorenzo's request to review the ALJ decision on February

1, 2012, meaning the ALJ's decision is the final decision of the Commissioner.[6]

## II.    Factual Background

The facts set forth under this section are derived from the administrative record. Mr. Lorenzo

was born October 3, 1958, and was forty-nine years old on December 31, 2007, the date last

ensured.[7] At 5'8" inches tall and 228.2 pounds at the time of the hearing,[8] Mr. Lorenzo was

considered obese with a body mass index of 34.7.[9] Mr. Lorenzo alleged disability beginning October

1, 2006 and remained insured through December 31, 2007.[10] Mr. Lorenzo must establish that he

became disabled during this period.[11]

Mr. Lorenzo listed several ailments in his application for benefits; the ALJ found only Mr.

Lorenzo's congestive heart failure, hypertension, degenerative disc disease and obesity to be severe

impairments.[12] We will limit our review to these four severe impairments.

### A.    Congestive Heart Failure and Hypertension

It is well documented in the record that Mr. Lorenzo has suffered from, and been treated for,

---

[4] R. at 96.
[5] R. at 22.
[6] R. at 1.
[7] R. at 233.
[8] R. at 258.
[9] R. at 13.
[10] R. at 10.
[11] *Id.*
[12] R. at 12.

congestive heart failure and hypertension since 2006.[13] According to the record, Mr. Lorenzo had

four echocardiograms, and one stress test during the period in question.[14] The primary method of

calculating Mr. Lorenzo's heart function was the ejection fraction of his left ventricle, which can

be approximated from an echocardiogram, and more exactly measured during a stress test.[15] Philip

Liebson, M.D., of the Rush University Heart Institute ("Heart Institute"), noted on October 6, 2006

that Mr. Lorenzo had an enlarged left ventricle, reduced heart contraction speed and efficiency.[16]

As a result, Dr. Liebson estimated Mr. Lorenzo's ejection fraction, the portion of blood ejected from

the left ventricle at the end of each heart contraction, to be ten to fifteen percent.[17] The normal,

healthy, range for left ventricle ejection fraction is approximately between fifty-five to sixty-five

percent.[18]

Mr. Lorenzo returned to the Heart Institute for a stress test ordered by Richard Abrams,

M.D., an internist at Rush University, on October 16, 2006.[19] The test noted: (1) normal heart rate

response to stress, (2) no chest pain, (3) a moderately reduced left ventricular ejection fraction of

thirty-one percent, and (4) the symptoms were not reproduced under light activity.[20]

In a report to Dr. Abrams dated November 7, 2006 by Christian Spies, M.D., and R. Jeffrey

Snell, M.D., the Director of Interventional Cardiology at the Heart Institute and Mr. Lorenzo's

---

[13]R. at 280-281.

[14]R. at 246, 252, 280, 283, 287, 289, 291, 293.

[15]R. at 280-281.

[16]R. at 246, 252, 291 (finding moderately dilated left ventricle, markedly reduced systolic function, severe diffuse hypokinesis and an ejection fraction estimated in the range of 10-15 percent); Stedman's Medical Dictionary 934, 1929, 2114-2115 (Lippincott, Williams & Wilkins eds., 29th ed.).

[17]R. at 291; J.E. Schmidt, M.D., Attorney's Dictionary of Medicine and Word Finder E-38 (Cumulative Supplement December 2005).

[18]Pfisterer ME, Battler A, Zaret BL, *Range of normal values for left and right ventricular ejection fraction at rest and during exercise assessed by radionuclide angiocardiography*, (June 6, 2013), http://www.ncbi.nlm.nih.gov/pubmed/4054134.

[19]R. at 280, 293.

[20]R. at 249-250, 293-294.

treating cardiologist, noted that Mr. Lorenzo was diagnosed with New York Heart Association Class II ("heart classification").[21] Mr. Lorenzo's heart classification means that he has "slight limitation of physical activity," is "comfortable at rest," and "ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain."[22] On November 17, 2006 Mr. Lorenzo underwent another exam; Dr. Snell estimated a below average ejection fraction of thirty-five percent.[23] Mr. Lorenzo's estimated ejection fraction had improved from the ten to fifteen percent estimate on October 6, 2006.[24]

The following year, on March 26, 2007 Mr. Lorenzo visited the Rush University Emergency Room complaining of lower back pain which was aggravated by movement or bending.[25] During a physical exam, Anthony Zelazny, M.D., the attending clinician, noted a history of cardiac disease but found no heart murmurs, rubs or gallops.[26] On May 3, 2007, Mr. Lorenzo underwent a consultative examination with Norbert De Biase, M.D., who noted (1) uncontrolled hypertension but current medical treatment; and (2) his congestive heart failure was stable with current medical treatment.[27] Dr. Snell ordered another echocardiogram on May 22, 2007, which found a normally functioning left ventricle with an estimated ejection fraction within normal range, which was a marked improvement from his October 6, 2006 echocardiogram.[28] Mr. Lorenzo had a minor impairment of his left ventricle causing it to not fully relax and expand, which resulted in a smaller

---

[21] R. at 281.
[22] *Classification of Functional Capacity and Objective Assessment*, (June 1, 2013), http://my.americanheart.org/professional/StatementsGuidelines/ByPublicationDate/PreviousYears/Classification-of-Functional-Capacity-and-Objective-Assessment_UCM_423811_Article.jsp.
[23] R. at 246, 283.
[24] R. at 246, 252, 291.
[25] R. at 243-244.
[26] R. at 243-245.
[27] R. at 259.
[28] R. at 289, 291.

amount of blood pumped through the circulatory system with each contraction of the heart.[29] On December 4, 2007, in the last exam before the period in question ended, Dr. Snell found normal heart function, an ejection fraction within the normal range, and a mild asymmetric enlargement of his heart.[30]

In a residual function capacity assessment for the Social Security Administration on August 27, 2009, Frank Jimenez, M.D., noted that medical evidence supported the existence of congestive heart failure and hypertension.[31] Dr. Jimenez also noted Dr. Biase's consultive examination on May 3, 2007 that found both congestive heart failure and hypertension to be stable.[32] Finally, Dr. Jimenez noted that there was no evidence in the record of organ damage as a result of any of Mr. Lorenzo's heart conditions.[33]

## B.  Degenerative Disc Disease

As noted in the previous section, on March 26, 2007, Mr. Lorenzo was admitted to the Rush University Emergency Room complaining of lower back pain which was aggravated by movements such as bending.[34] Mr. Lorenzo described to Dr. Zelazny how he had fallen a few weeks earlier and injured his lower back.[35] Prior to March 2007, there is no medical evidence in the record of back pains.[36] Dr. Zelazny's examination noted mild compression of three vertebrae in the lower back

---

[29] R. at 289 (grade I diastolic dysfunction); Schmidt, Attorney's Dictionary of Medicine and Word Finder, *supra*, at D-114.
[30] R. at 287 (mild asymmetric hypertrophy involving focal basal segments);Schmidt, Attorney's Dictionary of Medicine and Word Finder, *supra*, at B-37, F-132-133, H-258.
[31] R. at 273.
[32] *Id.*
[33] *Id.*
[34] R. at 243-244.
[35] R. at 244.
[36] R. at 16.

which was considered temporary in nature[37] and bone spurs between vertebrae causing pain.[38] Mr. Lorenzo was prescribed Norco for his pain and the record noted that the maximum severity was mild, and that his back was tender but he appeared comfortable.[39]

Mr. Lorenzo underwent a consultive examination with Dr. Biase for the Bureau of Disability Determination Services on May 3, 2007. Dr. Biase noted significant decreased range of motion in his lower back and tenderness in his lower back and shoulders.[40] A spinal x-ray revealed growing bone spurs which caused pain.[41] Mr. Lorenzo was able to walk fifty feet unassisted at a slow pace but was unable to perform toe, heel, tandem, and squatting maneuvers because of pain in his back.[42] Dr. Biase concluded his examination by noting both Mr. Lorenzo's limited motion[43] and his uncontrolled and unmedicated back pain.[44]

In Mr. Lorenzo's residual function capacity assessment for the Social Security Administration on August 27, 2009, Dr. Jimenez considered Dr. Biase's consultative examination in determining Mr. Lorenzo's exertional and postural limitations.[45] Dr. Jimenez also noted normal grip strength, reflexes and feeling.[46] Dr. Jimenz found medical evidence for some of Mr. Lorenzo's

---

[37]Schmidt, Attorney's Dictionary of Medicine and Word Finder, *supra*, at F-113, S-245; *Human Vertebral Column*, Encyclopaedia Britanica Online, (June 10, 2013), http://www.britannica.com/EBchecked/topic/626589/vertebral-column.

[38]R. at 243 (mild anterior wedging of the T11-L1 vertebral bodies considered temporary in nature, mild narrowing and small anterior osteophytes); Schmidt, Attorney's Dictionary of Medicine and Word Finder, *supra*, at O-122, E-246.

[39]R. at 244-225.

[40]R. at 16, 258-259 (decreased range of motion in lumbosacral spine); Schmidt, Attorney's Dictionary of Medicine and Word Finder, *supra*, at L-196-197 .

[41]R. at 265 (degenerative osteophyte); Schmidt, Attorney's Dictionary of Medicine and Word Finder, *supra*, at O-122.

[42]R. at 258.

[43]R. at 261.

[44]R. at 259.

[45]R. at 267-268, 273.

[46]R. at 273.

complaints and determined him able to perform light work.[47] Dr. Jimenez found Mr. Lorenzo to be

"partially credible" because of the inconsistencies between his complaints of back pain and the

medical record.**[48]**

## C.    Obesity

During the period at issue, Mr. Lorenzo was between 222.6 to 245 pounds.[49] While Mr.

Lorenzo's weight is noted throughout the medical record, he is never referred to as obese nor are

there notations regarding his weight and how that affected his other impairments.[50] It is unclear

which record the ALJ relied on in noting Mr. Lorenzo's BMI to be 34.7.[51] An individual with a BMI

over 30.0 is considered obese.[52]

## III.    ALJ Hearing and Decision

The hearing before the ALJ occurred on September 20, 2010 in Orland Park, Illinois.[53] Mr.

Lorenzo was present and represented by Agustin G. Garcia, an attorney.[54] Also present was Richard

T. Fisher, a vocational expert ("VE").[55] On October 27, 2010, the ALJ concluded that Mr. Lorenzo

was not disabled, "as defined in the Social Security Act, at any time from October 1, 2006, the

alleged onset date, through December 31, 2007, the date last insured."[56]

---

[47]*Id.*

[48]*Id.*

[49]R. at 246, 251.

[50]R. at 257-258 (noting claimant weighed 228.2 pounds on May 3, 2007), 278-279 (finding Mr. Lorenzo unable to work full time in Dr. Snell's retrospective opinion, which does not mention weight), 281-282 (describing Mr. Lorenzo as a "well nourished gentleman"), 291 (noting claimant weighed 245 pounds on October 6, 2006), 293 (noting claimant weighed 226 pounds on October 16, 2006).

[51]R. at 13; *see About BMI for Adults*, (June 8, 2013), www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/ (explaining the calculation of BMI as "dividing weight in pounds by height in inches squared and multiplying by a conversion factor of 703").

[52]R. at 13; *About BMI for Adults*, *supra*.

[53]R. at 10.

[54]*Id.*

[55]*Id.*

[56]R. at 22 (citation omitted).

## A.    Mr. Lorenzo's Testimony

Mr. Lorenzo began his testimony by confirming that he became disabled in October 2006, and that he lived with his parents and sister during the time in question.[57] Mr. Lorenzo also confirmed that he had a high school education and could read and write.[58] Mr. Lorenzo testified that before becoming ill in 2006, he had a number of jobs, the last of which was as a drywall installer.[59] From approximately 2004 to 2006, Mr. Lorenzo worked as a stock clerk and supervisor.[60] Mr. Lorenzo also worked part time for Avon sales throughout most of this time period.[61]

Mr. Lorenzo testified that between 2006 and 2007, he was diagnosed with congestive heart failure, high blood pressure, high cholesterol, and gout, as well as back problems.[62] Mr. Lorenzo testified that he believed he was prescribed hydrocodone for his back pain.[63] When Mr. Lorenzo became ill, he stopped drinking[64] and moved in with his parents and sister who helped take care of him.[65] Mr. Lorenzo testified that he was able to dress himself[66] but he suffered from shortness of breath, weakness in his hands and fingers,[67] and could not bend or squat.[68] Mr. Lorenzo testified that he was told his breathing was hindered due to his heart condition, which also caused him to become easily fatigued.[69] Mr. Lorenzo testified that he was dependant on his parents and sister for housework, laundry, groceries and transportation.[70] Mr. Lorenzo also testified that he became tired

---

[57]R. at 35-36.
[58]R. at 40, 57-58.
[59]R. at 41.
[60]R. at 43; *see also* R. at 219 (worked for Logan Foods Inc. from August 1, 2004 to October 5, 2006).
[61]R. at 44.
[62]R. at 45.
[63]R. at 48.
[64]R. at 45-47.
[65]R. at 34-36, 59.
[66]R. at 56-57.
[67]R. at 57-58.
[68]R. at 48-49.
[69]R. at 49-50.
[70]R. at 38, 50.

after only short walks, and spent most of his time watching television or napping.[71]

Next, the ALJ asked about Mr. Lorenzo's memory during the time in question, he testified that it was "pretty good," but his heart medication caused him to have difficulty following news stories.[72] As a followup, the ALJ told Mr. Lorenzo that she was trying to assess his mental functioning and asked if he was "unable to understand, or just not interest."[73] Mr. Lorenzo testified that he was "not interested" and "not paying attention," television was "just something to see till [he] fall back asleep."[74]

Finally, Mr. Lorenzo testified that his back injury made sitting uncomfortable.[75] After a "couple of minutes," he would need to move around, or lay down and that he could not stand for long periods of time.[76]

### B.      Letters from Mr. Lorenzo's Parents and Sister

Mr. Lorenzo's family was not present at the hearing. But pursuant to the ALJ's request, two signed letters explaining his condition during the time period Mr. Lorenzo was under their care were entered into the record.[77]

Mr. Lorenzo's parents, Hilario and Ana Lorenzo, describe in their letter dated September 27, 2010, that while Mr. Lorenzo was ill from 2006 to 2008, they assisted him with his medication, showering, and feeding.[78] Also, Mr. Lorenzo was assisted in and out of his bed.[79]

---

[71]R. at 50-54, 56.
[72]R. at 53-54.
[73]R. at 54.
[74]*Id.*
[75]R. at 55.
[76]R. at 55-56.
[77]R. at 34-35.
[78]R. at 224-225.
[79]R. at 225.

Mr. Lorenzo's sister, Nancy Lorenzo, also included a letter dated September 27, 2010.[80] Nancy wrote that Mr. Lorenzo moved from his third floor apartment to the first floor because his condition did not allow him to walk up the stairs.[81] During 2007 and 2008, the family assisted Mr. Lorenzo by cooking, and helping him move from one place to the next in the house.[82] Nancy also noted that Mr. Lorenzo required assistance using the restroom and the shower because he would become "dizzy, short of breath, and weak."[83]

### C.      VE's Testimony

Lastly, the VE testified.[84] The ALJ asked the VE two hypotheticals.[85] The last hypothetical provided for an individual between the age of forty-five and forty-nine and had a high school education similar to Mr. Lorenzo.[86] The hypothetical person had the residual functional capacity to lift ten pounds occasionally or frequently, could stand for no more than two hours in an eight hour work day, and sit for six hours in an eight hour work day, could occasionally climb ramps or stairs, and could occasionally balance, stoop, crouch, crawl, or kneel, and could never climb ladders, ropes, or scaffolds.[87] The VE testified that the hypothetical individual would not be able to perform all of the claimant's past work.[88] When asked if that individual could perform any occupation, the VE testified that the individual would be able to perform sedentary, unskilled work such as ticket taker, order clerk or telephone quote clerk.[89] Finally, the VE testified that all three positions existed in

---

[80]R. at 227.
[81]*Id.*
[82]*Id.*
[83]R. at 228.
[84]R. at 60.
[85]R. at 78.
[86]*Id.*
[87]*Id.*
[88]*Id.*
[89]R. at 78-79.

Illinois.[90]

**D.      ALJ's Decision**

In an opinion issued on October 27, 2010, the ALJ concluded that Mr. Lorenzo was not disabled within the meaning of the Act from October 1, 2006, through December 31, 2007, the last date insured.[91] The Social Security Administration has prescribed a sequential five-step evaluation process for determining whether a claimant is disabled.[92] The ALJ's first step is to consider whether the claimant is engaged in substantial gainful activity, which would preclude a disability.[93] In the present case, the ALJ determined that Mr. Lorenzo was "not engaged in substantial gainful activity during the period from his alleged onset date of October 1, 2006 through his date last insured of December 31, 2007."[94]

The second step is for the ALJ to consider "whether the claimant has a medically determinable impairment that is severe or a combination of impairments that is severe."[95] In the present case, the ALJ concluded that Mr. Lorenzo had the medically determinable severe impairments of congestive heart failure, hypertension, degenerative disc disease and obesity.[96] The ALJ also found that Mr. Lorenzo's alcohol abuse was not a severe impairment because he was clean and sober during the period at issue.[97] Finally, the ALJ found that Mr. Lorenzo's gout was not severe because the medical evidence did not support significant limitations as a result of gout in 2007, and the first medical evidence indicating swelling and pain appears in the record in 2009.[98]

---

[90]R. at 79.
[91]R. at 22.
[92]R. at 10; 20 C.F.R. 404.1520(a).
[93]R. at 11; 20 C.F.R. 404.1520(b).
[94]R. at 12.
[95]R. at 11; 20 C.F.R. 404.1520(c).
[96]R. at 12.
[97]*Id.*
[98]R. at 12-13.

The ALJ's third step is to consider "whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in the regulations as being so severe as to preclude gainful activity."[99] In the present case, the ALJ determined that Mr. Lorenzo's impairments did not meet or medically equal a listed impairment under 20 CFR Part 404, Subpart P, Appendix 1.[100] The ALJ considered listing 1.04 for disorders of the spine, which considers a person disabled if there is "evidence of nerve root compression" that results in pain, limited motion, and lack of reflex.[101] Mr. Lorenzo failed to meet the requirement for this listing because he lacked nerve root compression and he was still able to ambulate effectively.[102] Next, the ALJ also considered 4.02 for chronic heart failure, which requires medically documented evidence of systolic failure or distolic failure and (1) persistent symptoms of heart failure which very seriously limit the ability to complete daily living activities, (2) three or more separate episodes of acute congestive heart failure within a consecutive twelve month period, or (3) an inability to perform on an exercise tolerance test.[103] Mr. Lorenzo did not display the necessary symptoms, functional limitations and evidence necessary to meet or equal the listing.[104] Last, the ALJ considered Social Security Ruling 02-1p for the evaluation of obesity.[105] Mr. Lorenzo is considered to have level I obesity according to the Clinical Guidelines and his BMI, calculated by the ALJ.[106] The ALJ found that Mr. Lorenzo failed to meet or equal the listing because of his ability to ambulate without

---

[99]R. at 11, 13; 20 C.F.R. 404.1520(d), 404.1525, 404.1526.
[100]R. at 13.
[101]20 C.F.R. § 404 app. 1, 104(A).
[102]R. at 13.
[103]20 C.F.R. § 404 app. 1, 402.
[104]R. at 13.
[105]*Titles II & XVI: Evaluation of Obesity*, SSR 02-1P (S.S.A. Sept. 12, 2002).
[106]*Id.*

assistance.[107] However, she considered his obesity and its effects in later steps.[108]

In the event that no impairments are found to meet the Social Security Ruling listing requirements, the ALJ proceeds to the fourth step of the test, in which the ALJ must first determine the claimant's residual functional capacity ("RFC").[109] The RFC is an assessment of the maximum work-related activities a claimant can perform despite his limitations.[110] The claimant's RFC is used to determine whether he is able to perform his past relevant work.[111] This involves evaluating the claimant's RFC based on the record of his testimony and comparing it to the requirements of his past work.[112]

If determining the claimant's RFC requires the ALJ to assess subjective complaints, then the ALJ follows a two-step process.[113] First, the ALJ must determine whether there is an underlying medically determinable impairment, which can be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the claimant's symptoms.[114] If so, the ALJ then evaluates the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning and ability to do basic work.[115] When making determinations about the credibility of the claimant's subjective complaints, the ALJ must consider the entire record.[116] The ALJ need only consider the

---

[107]R. at 13, 258.
[108]R. at 13.
[109]20 C.F.R. 404.1520(e).
[110]R. at 14.
[111]20 C.F.R. 404.1520(f), 404.1565.
[112]*Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P (S.S.A. July 2, 1996).
[113]*Id.*
[114]*Id.*
[115]*Id.*
[116]*Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of Individual's Statements*, SSR 96-7P (S.S.A. July 2, 1996).

subjective symptoms to the extent that they can reasonably be accepted as consistent with the objective medical evidence and other evidence.[117] If the ALJ determines that the claimant's RFC makes him capable of performing his past work, the claimant is not disabled.[118]

Here, the ALJ decided that Mr. Lorenzo had the RFC to perform sedentary work as defined in 20 CFR 404.1567(a).[119] The ALJ added additional limitations that he could not climb ladders, ropes, or scaffolds, and that Mr. Lorenzo's medications and fatigue would limit him to simple, routine and repetitive tasks.[120] In support of the RFC, the ALJ then moved to an analysis of the claimant's subjective complaints, symptoms and Mr. Lorenzo's credibility.

In her credibility determination, the ALJ pointed to inconsistent statements concerning the intensity, persistence and limiting effects of Mr. Lorenzo's symptoms and "the medical evidence and other evidence of record that supported that he was able to work in another capacity within the confines of the residual functional capacity."[121] The ALJ found Mr. Lorenzo and his family members were not fully credible in their testimony describing extreme limitations, and the medical evidence does not support the inability to function for a period of one year or longer.[122]

The ALJ began by considering Mr. Lorenzo's complaint that his back pain was one factor which prevented him from working.[123] The ALJ noted some diagnostic and clinical findings that referenced back impairment and pain, but the ALJ found that there was very little medical treatment for Mr. Lorenzo's back pain.[124] The ALJ reasoned that Mr. Lorenzo's "lack of ongoing treatment

---

[117]*Id.*
[118]SSR 96-8P.
[119]R. at 13.
[120]*Id.*
[121]R. at 17-18.
[122]R. at 19.
[123]R. at 18.
[124]*Id.*

suggest[ed] that the claimant's back pain and resulting limitations were not as debilitating as he and his family members have suggested."[125] The ALJ noted Dr. Zelazny's findings on March 26, 2007, describing Mr. Lorenzo's back issues as "mild" and "presumably transitional in nature."[126] The ALJ also noted that despite Dr. Biase's determination that the claimant's back condition was uncontrolled the claimant failed to seek additional treatment.[127] The ALJ concluded that Mr. Lorenzo's "lack of treatment for his back condition and pain [did] not support an inability to work."[128]

Next, the ALJ considered Mr. Lorenzo's complaint that in addition to back pain, his congestive heart failure, high cholesterol and high blood pressure prevented him from working.[129] The ALJ noted that Dr. Biase indicated that in May 2007, Mr. Lorenzo's congestive heart failure was stable. He also refrenced his hypertension and hypercholesterolemia were both being treated by medication.[130] As a result, the ALJ discredited Mr. Lorenzo's testimony that he was unable to do anything but lie around and watch television.[131]

The ALJ also discredited Mr. Lorenzo's testimony that his memory was affected by his medication, noting the lack of support in the medical record.[132] The ALJ noted a lab report in November 2006,[133] a consultative examination for the Bureau of Disability Determination Services in May 2007[134] and Mr. Lorenzo's Adult Functioning Report,[135] all of which supported normal

---

[125]*Id.*
[126]R. at 18, 243.
[127]R. at 18.
[128]*Id.*
[129]*Id.*
[130]R. at 18, 259.
[131]R. at 18.
[132]*Id.*
[133]R. at 245.
[134]R. at 259.
[135]R. at 213.

memory and no side effects from medication.[136] Thus, the ALJ concluded that the medical record did not support Mr. Lorenzo's memory complaints.[137]

Last, the ALJ considered Mr. Lorenzo's complaints of shortness of breath and fatigue.[138] The ALJ examined the opinion of Dr. Snell, who opined that Mr. Lorenzo's condition was mild and caused slight limitation during physical activity according to his heart classification.[139] Dr. Snell further opined that Mr. Lorenzo was unable to work full time.[140] The ALJ found Dr. Snell's two opinions to be inconsistent and discredited Dr. Snell's opinion that Mr. Lorenzo was unable to work as conclusory and lacking medical support.[141] The ALJ concluded that Mr. Lorenzo's heart classification was consistent with sedentary work.[142] The ALJ noted and gave some weight to Dr. Jimenez's opinion in August 2009, who found that Mr. Lorenzo was capable of light exertional work during the relevant period.[143]

The ALJ found the claimant able to perform sedentary work with the limitations set forth in the RFC and was capable of sustaining competitive work consistent with the RFC.[144] In reaching this conclusion, the ALJ considered Mr. Lorenzo's fatigue, shortness of breath, obesity and pain.[145] The ALJ noted the VE's opinion that Mr. Lorenzo was unable to perform past relevant work.[146] The ALJ considered the testimony of the VE who opined that Mr. Lorenzo could perform three positions

---

[136]R. at 18.
[137]*Id.*
[138]*Id.*
[139]R. at 20.
[140]R. at 19-20.
[141]R. at 20.
[142]*Id.*
[143]R. at 20, 267, 273.
[144]R. at 20.
[145]R. at 19.
[146]R. at 20.

including: ticket checker, order clerk and telephone quote clerk.[147] The ALJ concluded that based on the VE's testimony, Mr. Lorenzo "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy."[148]

## IV.    Standard of Review

The Court must sustain the Commissioner's findings of fact if they are supported by substantial evidence and are free of legal error.[149] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[150] The standard of review is deferential, but the reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision.[151] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner and not the Court.[152] Although the ALJ need not address every piece of evidence or testimony presented, she must adequately discuss the issues and build an accurate and logical bridge from the evidence to the conclusion.[153] The Court will conduct a critical review of the evidence and will not uphold the ALJ's decision if it lacks evidentiary support or "if the Commissioner applied an erroneous legal standard."[154]

## V.    Analysis

---

[147]R. at 21.
[148]R. at 21-22.
[149]42. U.S.C. § 405(g).
[150]*McKenzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citing *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)).
[151]*Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005)).
[152]*Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).
[153]*Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *McKinzey*, 641 F.3d at 889.
[154]*Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citing *Rohan v. Charter*, 98 F.3d 966, 970 (7th Cir. 1996)).

Mr. Lorenzo proffers four principal arguments for remand: (1) the ALJ improperly weighed the opinion of Dr. Snell, his primary treating physician; (2) the ALJ failed to sufficiently account for the limitations stemming from his obesity; (3) the ALJ's credibility analysis was patently wrong because the ALJ dismissed his complaints of frequent, severe pain; and (4) the ALJ erred in determining his RFC because she found that Mr. Lorenzo was able to lift, perform simple tasks even when confused and drowsy, and did not account for his need to lie down.

## A.    The ALJ Properly Weighed the Opinion of Dr. Snell

Mr. Lorenzo argues that the ALJ gave improper weight to the opinion of his treating cardiologist, Dr. Snell.[155] The Commissioner contends that Dr. Snell's opinion lacked objective medical evidence and was inconsistent with other substantial medical evidence in the record, warranting the ALJ's decision to not give Dr. Snell's opinion controlling weight.[156]

Generally, the claimant's treating physician is given more weight, but the opinion will only be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the medical record."[157] The ALJ will determine which treating and examining doctors' opinions should receive weight in a Social Security DIB and SSI case and, in doing so, she must explain the reasons for her finding.[158] If the ALJ decides not to assign this weight to the treating physician, she will consider factors such as length of treatment, nature of treatment, supportability, consistency, specialization,

---

[155]Pl. Mem. at 11, dkt. 20.
[156]Def. Mem. at 8-10, dkt. 23.
[157]20 C.F.R § 404.1527(c); S.S.R. 96-5P; *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006 ) (finding that the treating physician's evidence is no longer entitled to controlling weight once well-supported contradicting evidence is introduced).
[158]20 C.F.R § 404.1527(d), (f), 416.927(d), (f); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

and additional factors to determine how much weight to allocate to the opinion of each physician.[159] The ALJ must articulate why particular statements or reports are necessarily inconsistent.[160] The ALJ need not address every piece of evidence or testimony present but, rather, must provide a "logical bridge" between the evidence and the ALJ's conclusion.[161]

In this case, the ALJ gives Dr. Snell's opinion some weight, as opposed to the controlling weight sometimes given to the treating physician, for two reasons.[162] First, the ALJ noted the medical questionnaire submitted by Dr. Snell, which stated that prior to December 2007, Mr. Lorenzo had an ejection fraction of ten to fifteen percent.[163] The ALJ further noted that while Mr. Lorenzo did have an ejection fraction in the range of ten to fifteen percent by October 6, 2006,[164] his ejection fraction rose considerably during the period in question to be within the normal range according to an echocardiogram performed at Heart Institute on December 3, 2007.[165] Therefore, Dr. Snell's opinion was inconsistent with Mr. Lorenzo's considerable improvement, into the normal range for left ventricle ejection fraction, before December 31, 2007, the last date insured.[166]

Second, the ALJ found Dr. Snell's opinion regarding the claimant's heart classification

---

[159]20 C.F.R § 404.1527(c).

[160]*Clifford*, 227 F.3d at 871 (explaining that in order to adequately articulate her reasoning for discounting a treating physician's opinion, the ALJ must explain why the treating physician's statements were inconsistent with others in the record).

[161]*Jones*, 623 F.3d at 1160; *see also Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (citing *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (finding that the ALJ must sufficiently articulate her assessment of evidence to create a traceable path of reasoning and to provide assurance that she considered the important evidence).

[162]R at 20.

[163]R at 20, 278.

[164]R. at 246, 252, 291.

[165]R. at 287; *see* R. at 249-250 (noting on October 16, 2006: moderately reduced left ventricular ejection fraction of thirty one percent), 246, 283 (noting on November 17, 2006: estimated ejection fraction of thirty five percent), 289 (noting on May 22, 2007: estimated ejection fraction range of fifty five to sixty five percent).

[166]Pfister et al., *Range of normal values for left and right ventricular ejection fraction, supra.*

inconsistent with his own conclusion that Mr. Lorenzo was unable to work.[167] Initially, the ALJ

noted "that a statement by a medical source that the claimant is disabled or unable to work is

conclusory and an issue reserved for the Commissioner."[168] While the ALJ must consider medical

opinion evidence  about any issue, "treating source opinions on issues that are reserved to the

Commissioner are never entitled to controlling weight or special significance."[169] The ALJ then

discounted Dr. Snell because the heart classification he determined Mr. Lorenzo to have is actually

defined as "denot[ing] mild symptoms and slight limitation during physical activity."[170] The ALJ,

therefore, concluded that this would not prohibit him from performing sedentary work.[171] For the

purpose of this review, we acknowledge that there is no description or definition of Mr. Lorenzo's

heart classification in the record, but the description given by the ALJ, the definition noted above,

is similar to the description found on the American Heart Association website.[172] Despite the

classification denoting only slight limitation during physical activity, Dr. Snell opined that Mr.

Lorenzo could not work because of his heart classification.[173] Those two positions could reasonably

be considered inconsistent. The ALJ's decision to give Dr. Snell's opinion less weight, then, was

supported by this inconsistent evidence.[174]

---

[167]R. at 20.

[168]*Id.*

[169]*Titles II and Xvi: Med. Source Opinions on Issues Reserved to the Commr.*, SSR 96-5P (S.S.A July 2, 1996); *see Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012) (finding that the ALJ must not ignore a doctor's opinion that a claimant cannot work, though no special significance is owed to the statement).

[170]R. at 20; *see Classification of Functional Capacity and Objective Assessment*, *supra*, (Class II: "Patients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain.").

[171]R. at 20.

[172]Id.; *see also Classification of Functional Capacity and Objective Assessment*, *supra*.

[173]R. at 279; *see Classification of Functional Capacity and Objective Assessment*, *supra*.

[174] 20 C.F.R § 404.1527(c); S.S.R. 96-5P; *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006 ) (finding that a treating physician's evidence is no longer entitled to controlling weight once well-supported contradicting evidence is introduced).

These reasons - the lack of objective medical evidence and inconsistencies with other medical evidence - sufficiently explain why the ALJ did not give Dr. Snell's opinion controlling weight.[175] Thus, we conclude that the ALJ's decision was supported by substantial evidence,[176] and the ALJ created the necessary "logical bridge" connecting the evidence with her conclusion.[177]

## B.    The ALJ Properly Accounted for Mr. Lorenzo's Obesity

Mr. Lorenzo argues that the ALJ did not properly consider his obesity in combination with his other impairments.[178] Specifically, he claims that the ALJ did not offer a detailed analysis regarding how obesity might have impacted the "severity of [his] respiratory, cardiovascular, and musculoskeletal impairment."[179] In response, the Commissioner first asserts that the failure to consider Mr. Lorenzo's obesity in certain circumstances, when obesity is indirectly connected to the decision, is a harmless error. The Commissioner also claims that the ALJ, in fact, repeatedly referenced Mr. Lorenzo's obesity.[180]

The ALJ must factor obesity into the determination of the claimant's RFC by assessing what the effect obesity, in combination with other impairments, has upon the individual's ability to work.[181] The ALJ must also evaluate all limitations that arise from medically determinable

---

[175]R. at 19.

[176]*McKenzey*, 641 F.3d at 889 (citing *Skinner*, 478 F.3d at 841) ("such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

[177]*Jones*, 623 F.3d at 1160 (holding that an ALJ must provide a "logical bridge" from evidence to the conclusions so the finding can be reviewed); *see Lopez ex rel. Lopez*, 336 F.3d at 539 (holding that the ALJ must construct an "accurate and logical bridge from the evidence to his conclusion").

[178]Pl. Mem. at 13-14, dkt. 20 (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)).

[179]*Id*. at 13.

[180]Def. Mem. at 11, dkt. 23 (citing *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006); *Richards v. Astrue*, 320 Fed.Appx. 727, 733 (7th Cir. 2010)).

[181]*Id.*

impairments and may not dismiss a line of evidence contrary to the ruling.[182]

Mr. Lorenzo first asserts that similar to *Villano v. Astrue*, "the ALJ failed to analyze the combined effect of [his] obesity and [his] other impairments."[183] In that case, the ALJ was reversed in part because he failed to create the required logical bridge between the evidence and his conclusion that the claimant was not credible.[184] The ALJ also had failed to consider all of the claimant's impairments in his RFC determination that found him able to sit for six hours in an eight hour work-day without considering the combined effects of the claimant's obesity and other impairments.[185]

But here, in accordance with the clinical guidelines, the ALJ calculated Mr. Lorenzo's BMI to be 34.7 and classified him as obese.[186] The ALJ also considered SSR 02-1p and concluded that Mr. Lorenzo did not meet or equal the listing when she considered obesity in conjunction with his other severe impairments.[187] The ALJ stated that she would "consider his obesity in the sequential evaluation process and in assessing his RFC."[188] Finally, the ALJ noted Mr. Lorenzo's obesity, fatigue, shortness of breath and pain in her determination that he was limited to sedentary work.[189] Mr. Lorenzo's shortness of breath limited his ability to climb stairs, which the ALJ acknowledged when she limited climbing ramps and stairs to "occasional."[190] Finally, the ALJ noted that she

---

[182]S.S.R. 96–8p; *Villano*, 556 F.3d at 563 (citing *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir.2003)).
[183]556 F.3d at 563.
[184]*Id*. at 562.
[185]*Id*. at 563.
[186]R. at 13; *see* SSR 02-1P.
[187]R. at 13.
[188]*Id*.
[189]R. at 19.
[190]*Id.*

considered Mr. Lorenzo's obesity when making the additional postural limitations in Mr. Lorenzo's RFC finding.[191] Considering each of these notions, we find that unlike in *Villano*, the ALJ adequately considered Mr. Lorenzo's obesity and the effect it may have had on his other limitations in making her RFC conclusion, and explained how his obesity effected her postural limitation analysis.[192]

## C.      The ALJ Properly Assessed Mr. Lorenzo's Credibility

Mr. Lorenzo argues that the ALJ improperly assessed his credibility and erred in dismissing his complaints of pain.[193] The Commissioner argues that the ALJ provided an adequate explanation of Mr. Lorenzo's credibility by considering the "lack of ongoing treatment, the absence of regular pain medication, the treating physician's opinion, the medical evidence, and Mr. Lorenzo's allegations."[194]

According to SSR 96-7p, the ALJ must base her credibility finding on the entire record and must sufficiently explain her conclusion of the claimant's credibility.[195] The ALJ may consider, for the purposes of her credibility analysis, the claimant's pursuit of treatment, so long as she also considers any argument the claimant might offer such as over-the-counter medication or debilitating side effects.[196] In analyzing inconsistencies between a claimant's statements and medical evidence, an ALJ must investigate "all avenues" presented that relate to pain, including the observations by

---

[191]*Id.* (finding the claimant able to occasionally balance, stoop, kneel, crouch and crawl).
[192]S.S.R. 02-1P; 42 U.S.C. § 405(b)(1); *Villano*, 556 F.3d at 563; *Prochaska*, 454 F.3d at 738.
[193] Pl. Mem. at 15, 17, dkt. 20.
[194]Def. Mem. at 13, dkt. 23.
[195]*Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7P (S.S.A July 2, 1996).
[196]*Id.*

treating and examining physicians.[197] While the ALJ may not reject subjective complaints of pain solely because they are not supported by medical evidence, the ALJ may consider this conflict as probative of the claimant's credibility.[198] Last, this Court grants deference to the ALJ's credibility assessment, and will only overturn it if it is "patently wrong."[199]

In this case, the ALJ found Mr. Lorenzo to be not fully credible because the "medical evidence, physical examination and treatment provided" were inconsistent with the degree and severity of his subjective complaints. Specifically, the ALJ explained that: (1) he failed to pursue ongoing treatment for back pain that he testified was debilitating; (2) there was a lack of medical support for the severity of his shortness of breath, fatigue, and chest pain; and (3) there was a lack of medical support for his memory complaints.[200]

Consistent with SSR 96-7P, the ALJ noted that Mr. Lorenzo had "very little medical treatment for his back pain," and he did not use "any pain medication on a regular basis."[201] The ALJ also noted the lack of any "physical therapy, steroid injections, or any other type of therapy or treatment to support his limitations with regard to back pain."[202] Such inconsistencies between subjective complaints and medical evidence "casts doubt on [his] credibility."[203]

Next, the ALJ noted that the record contained some complaints of shortness of breath and fatigue, but that the diagnostic testing and procedures showed that Mr. Lorenzo's heart condition

---

[197]*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994).
[198]*Powers*, 207 F.3d at 435.
[199]*Jones,* 623 F.3d at 1160; *see also Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (finding that an ALJ's credibility determinations must have been "patently wrong" in order to be overturned).
[200]R. at 18-19.
[201]R. at 18.
[202]*Id.*
[203]*Powers*, 207 F.3d at 435 (finding "the discrepancy between the minimal impairment expected from her conditions and her testimony of debilitating pain casts doubt on her credibility").

improved and that he reported no side effects from his medication.[204] The ALJ supported her conclusion further by noting that Mr. Lorenzo did not "have frequent trips to the doctor or hospital with severe complaints of shortness of breath and fatigue" that would support his complaint that he was unable to do anything besides lie around.[205]

Last, the ALJ noted that the medical record did not support Mr. Lorenzo's testimony that his memory was affected by his medication, and his testimony was contradicted by his Adult Function Report, where he claimed to have no side effects from his medication.[206] Therefore, while the ALJ may not completely ignore Mr. Lorenzo's complaints of poor memory because they are not supported by medical evidence, the lack of support is probative of his credibility.[207]

As a result, the ALJ gave partial credit to Mr. Lorenzo's reports of pain and functional limitations in assessing her RFC, despite his physical examination that revealed inconsistences between the medical record and his testimony.[208] The ALJ also limited Mr. Lorenzo to simple, routine, and repetitive tasks because of his complaints of fatigue and confusion from his heart medication, even though he reported no side effects from his medication in his Adult Function Report.[209] The ALJ also considered the opinion of Dr. Snell, giving him some weight because he was Mr. Lorenzo's treating physician and a cardiovascular specialist,[210] and noted the reports from Mr. Lorenzo's family members in her RFC finding, despite not finding them completely credible in

---

[204]R. at 18.
[205]R. at 19.
[206]R. at 18, 213; *see* R. at 245, 259; *see Powers*, 207 F.3d at 435 (finding that discrepancies between testimony and objective medical evidence can cast doubt on the claimant's credibility).
[207]*See Powers*, 207 F.3d at 435.
[208]R. at 19.
[209]R. at 18-19, 180.
[210]R. at 20.

reducing Mr. Lorenzo's RFC to sedentary work.[211] Thus, the ALJ considered both Mr. Lorenzo's

testimony, and the testimony of others, when she determined that Mr. Lorenzo had a more restrictive

RFC than even Dr. Jiminez's findings supported.[212]

### D. The ALJ Properly Determined Mr. Lorenzo's RFC

Mr. Lorenzo's final argument is that the ALJ erred in her determination of his RFC by: (1)

failing to provide medical support for her conclusion, (2) failing to consider Mr. Lorenzo's fatigue

and confusion, and (3) failing to properly consider Mr. Lorenzo's back pain and his inability to sit

or stand for prolonged periods.[213]

When assessing a claimant's RFC, the ALJ must consider all limitations that arise from

medical impairments, regardless of the severity of the limitation.[214] The ALJ's RFC assessment must

be based on all of the relevant evidence, including, but not limited to, medical history, side effects

of medication, reports or daily activities, lay evidence, and effects of symptoms.[215] Lastly, the ALJ

must base her RFC determination in evidence, and explain how she reached her conclusions.[216]

### 1. The ALJ Supported Her RFC Conclusion With Medical Evidence

Mr. Lorenzo's first argument is that the ALJ failed to adequately explain her RFC

conclusion, and that the ALJ filled in the evidentiary gaps in the record without adequate

evidence.[217] The Commissioner counters by arguing that the ALJ is not required to cite direct

---

[211]R. at 19-20.
[212]R. at 19.
[213]Pl. Mem. at 7-11, dkt. 20.
[214]*Villano*, 556 F.3d at 563.
[215]*Title II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96.8P (S.S.A. July 2, 1996).
[216]*Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Briscoe ex. rel Taylor*, 425 F.3d at 352).
[217]Pl. Mem. at 7, dkt. 20 (citing *Suide v. Astrue*, 371 Fed.Appx. 684, 690 (7th Cir. 2010)).

evidence to support her RFC determination. Instead, the ALJ need only "provide that the RFC finding is based on all the evidence of record."[218]

The ALJ found that the medical evidence supported that Mr. Lorenzo was able to work within the confines of the RFC.[219] The ALJ noted that Mr. Lorenzo believed he was unable to work primarily because of back pain and congestive heart failure.[220] As discussed in the credibility analysis above, the ALJ noted that Mr. Lorenzo's failure to pursue treatment and medication did not support his complaint of debilitating back pain.[221] Next, the ALJ noted that Mr. Lorenzo's heart condition improved over the period in question, and was noted as stable with his current medication therapy.[222] Finally, the ALJ noted that Mr. Lorenzo's heart classification is defined as mild and would not prevent him from performing sedentary work.[223] In her conclusion, the ALJ referenced the opinions of both Dr. Jimenez and Dr. Snell, the medical record, the testimony of Mr. Lorenzo, and his family's reports.[224] The ALJ "made additional restrictions and reduced [Mr. Lorenzo] to sedentary work" based on the aforementioned factors.[225] Therefore, the ALJ based her RFC conclusion upon the evidence in the record and the hearing testimony, and explained how she reached her determination that Mr. Lorenzo is able to perform sedentary work.[226]

### 2. The ALJ Properly Accounted for Mr. Lorenzo's Fatigue and Confusion in Determining His RFC.

---

[218]Def. Mem. at 6, dkt. 23 (citing 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(3)).
[219]R. at 18.
[220]*Id.*
[221]18, 244, 258-9, 273.
[222]R. at 18, 259, 273, 287.
[223]R. at 19.
[224]R. at 18-19.
[225]R. at 19.
[226]*Scott*, 647 F.3d at 740 (citing *Moss*, 555 F.3d at 561; *Briscoe ex. rel Taylor*, 425 F.3d at 352).

Next, Mr. Lorenzo argues that the limitations created by his fatigue and confusion were not properly considered in the ALJ's RFC analysis.[227] He argues that without support from the record, the ALJ found that fatigue and confusion limited him to simple, routine, and repetitive tasks, but were not considered as more limiting.[228] The Commissioner argues that Mr. Lorenzo failed to submit medical evidence that would "prevent him from performing simple, routine, repetitive tasks, and the ALJ reasonably found that he could."[229]

The ALJ explicitly considered both fatigue and memory in her determination that Mr. Lorenzo could perform sedentary work.[230] Mr. Lorenzo's fatigue stemmed from his congestive heart failure, and the ALJ examined the record regarding the state of his heart condition, as well as his independent complaints of shortness of breath.[231] The ALJ noted that during an exam in May 2007, Mr. Lorenzo's congestive heart failure was determined to be stable, and nothing in the medical evidence supported that his fatigue made him unable to do anything but lie around.[232] Mr. Lorenzo argues that the ALJ failed to properly analyze his fatigue and need to lie down.[233] However, the ALJ supported her finding by noting that Mr. Lorenzo had no side effects from his medication, according to his Adult Function Report.[234] Additionally, during the period at issue, Mr. Lorenzo's heart

---

[227]Pl. Mem. at 7, dkt. 20.

[228]Pl. Mem. at 7, dkt. 20 (citing *O'Conner-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)).

[229]Def. Mem. at 7-8, dkt. 23 (citing *Shideler v. Astrue*, 688 F.3d 308, 311 n.1 (7th Cir. 2012) (finding that the ALJ may discredit subjective complaints if they are not supported by objective medical evidence)).

[230]R. at 18-19.

[231]*Id.*

[232]R. at 19, 259.

[233]*Martinez v. Astrue*, 2009 WL 4611415 *12 (N.D. Ind. 2009) (finding that an ALJ must connect the evidence and the claimant's credibility determination);*Cuevas v. Barnhart*, 2004 WL 1588277, *15 (N.D. Ill. 2004) (holding that the ALJ must explain her reasoning and may not ignore evidence that is contrary to her ultimate conclusion); *Holland v. Barnhart*, 2003 WL 22078383, *9 (N.D. Ill. 2003) (holding that the ALJ must discuss relevant evidence adequitely so that it is possible to review her conclusion).

[234]R. at 18.

condition, primarily measured through ejection fraction, improved from ten to fifteen percent, below normal, to fifty-five to sixty-five percent, within the normal range.[235] An ALJ may discredit subjective complaints if they are not supported by objective medical evidence and if she created the necessary logical connection between the evidence and the conclusion.[236] Thus, the ALJ did not err when she ascribed partial credibility to Mr. Lorenzo's subjective complaints because they were inconsistent with the objective medical evidence.[237]

Similarly, the ALJ noted that all of the medical evidence presented showed Mr. Lorenzo's memory as normal.[238] The ALJ considered Mr. Lorenzo's Disability Report Appeal in which he claimed to have no side effects from any of his medications.[239] The ALJ's dismissal of Mr. Lorenzo's complaints of memory issues because there was no objective medical evidence to support his subjective complaints does not constitute an error.[240] As a result, the ALJ sufficiently articulated her analysis of the record and the evidentiary support for her RFC assessment.[241]

### 3. The ALJ Properly Considered Mr. Lorenzo's Back Pain When Determining His RFC

Finally, Mr. Lorenzo argues that his back pain was improperly dismissed and the ALJ erred in finding him capable of sitting for six hours in an eight hour work-day.[242] Mr. Lorenzo argues that the ALJ failed to consider his need to lie down, and cited a number of cases where courts within the

---

[235]R. at 287, 291.
[236]*Shideler*, 688 F.3d at 311-12; *see Martinez*, 2009 WL 4611415 *12.
[237]*Id.*
[238]R. at 19, 243-259;
[239]R. at 19, 213.
[240]*Shideler*, 688 F.3d at 311-12 (finding that the ALJ may discredit subjective complaints if they are not supported by objective medical evidence).
[241]20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(3); *Title II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96.8P (S.S.A. July 2, 1996); *see Briscoe ex rel. Taylor*, 425 F.3d at 352.
[242]Pl. Mem. at 10, dkt. 20.

Seventh Circuit have reversed the ALJ on similar grounds.[243] Citing *Villano,* the ALJ found him able

to sit for six hours each day despite objective evidence of back pain.[244] But the Commissioner

responds by arguing that the ALJ sufficiently addressed Mr. Lorenzo's back pain and need to lie

down, and that the ALJ exceeded the minimum level of analysis necessary to allow the reviewing

court to follow her reasoning.[245]

We agree with the Commissioner that the ALJ sufficiently considered the record in making

her assessment of Mr. Lorenzo's RFC.[246] Unlike *Villano,* as we have already discussed, the ALJ

specifically considered Mr. Lorenzo's other impairments along with his complaints of pain when

discussing his postural limitations.[247] In *Villano,* the Court stressed the "cursory analysis" and failure

to consider the claimant's combination of impairments;[248] in this case, the ALJ articulated her

analysis of both.[249] In addition, the ALJ noted Mr. Lorenzo's first treatment in March 2007, and that

he was given Norco for his pain.[250] The ALJ also noted that the record showed no pursuit of any

"physical therapy, steroid injections, or any other type of therapy or treatment."[251] The ALJ

concluded that Mr. Lorenzo's failure to obtain treatment or regular pain medication does not support

---

[243]Pl. Mem. at 8-9, dkt. 20 (citing *Martinez,* 2009 WL 4611415 *12 (N.D Ind. 2009) (needing to lie down several times a day undermines finding the claimant capable of sedentary work); *Cuevas,* 2004 WL 1588277, *15 (N.D. Ill. 2004) (failing to consider the claimant's need to take a nap each day); *Holland,* 2003 WL 22078383, *9 (N.D. Ill. 2003) (failing to consider affect of fatigue on the claimant's job performance)).

[244]R. at 18, 55-56; *Villano,* 556 F.3d at 563 (finding the ALJ erred improperly drawing inferences about the claimant's ability to sit based solely on a lack of objective medical evidence without consideration of the claimant's other impairments).

[245]Def. Mem. at 8, dkt. 23(citing R. at 14-15, 18-19; *Johnsen v. Barnham,* 214 F.3d 283, 287 (7th Cir. 2002)(citation omitted)).

[246]*Id.*; *see* R. at 16-19.

[247]R. at 19.

[248]556 F.3d at 563.

[249]R. at 18-19.

[250]R. at 18.

[251]*Id.*

his claims of debilitating pain.[252] The Seventh Circuit has found that the failure to pursue treatment and medication can be used by the ALJ to consider the claimant's subjective complaints.[253] Further, the ALJ considered the conclusion of the March 2007 examination describing the maximum and current symptoms as mild.[254] The ALJ considered both inconsistencies in the record and Mr. Lorenzo's failure to pursue relief for his symptoms and, therefore, adequately considered the record in her assessment of his RFC.[255]

## IV.    Conclusion

For the reasons set forth above, Mr. Lorenzo's motion for summary judgment is denied [dkt. 19] and the Commissioner's motion is granted [dkt. 27].

**IT IS SO ORDERED.**

Date: July 2, 2013

Susan E. Cox
U.S. Magistrate Judge

---

[252]*Id.*
[253]*Orlando v. Heckler*, 776 F.2d 209, 214 (7th Cir. 1985) (finding that failure to take strong pain medication and a lack of any regular treatment for the claimant's condition can be considered when weighing subjective complaints).
[254]R. at 18, 244.
[255]R. at 18-19.